# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Detention of Lieberman*, 2011 IL App (1st) 090796

---

| | |
|---|---|
| Appellate Court Caption | *In re* DETENTION OF BRAD LIEBERMAN (The People of the State of Illinois, Petitioner-Appellee, v. Brad Lieberman, Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1–09–0796 |
| Filed | June 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent's petition for release or conditional discharge from his commitment to the Department of Human Services as a sexually violent person was properly dismissed, since the record disclosed a complete lack of any expert opinion that respondent was no longer a sexually violent person or that it was not substantially probable that respondent would engage in future acts of sexual violence, and the evidence presented did not establish probable cause to believe that respondent had made sufficient progress to be discharged or conditionally released. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00–CR–80001; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Giel Stein, of Stein Law Group LLC, and Kimball R. Anderson, Nathan Hoffman, and Aesha Pallesen, all of Winston & Strawn LLP, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and David H. Iskowich, Assistant Attorneys General, of counsel), for the People.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice R. Gordon concurred in the judgment and opinion.
Presiding Justice Garcia dissented, with opinion.

**OPINION**

¶ 1       In these proceedings under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2008)), respondent, Brad Lieberman, appeals from an order of the circuit court of Cook County finding that there was not probable cause to believe that respondent was no longer a sexually violent person. On appeal, respondent contends that the denial of his petition was an abuse of discretion and violated his right to due process of law. In our original decision issued on May 28, 2010, we found no abuse of discretion and affirmed the trial court's judgment. *In re Detention of Lieberman*, 401 Ill. App. 3d 903 (2010). On September 29, 2010, the Illinois Supreme Court directed us to vacate that decision and to reconsider in light of *In re Detention of Hardin*, 238 Ill. 2d 33 (2010). *In re Detention of Lieberman*, 237 Ill. 2d 557 (2010). After vacating our original judgment and reviewing *Hardin*, we conclude that a different result is not warranted and we therefore affirm the circuit court's judgment.

¶ 2       The record shows that in 1980, respondent was convicted of multiple counts of rape and sentenced to a number of concurrent terms of imprisonment, the longest of which required him to serve 40 years in prison. Immediately prior to his release from the Illinois Department of Corrections (IDOC) in 2000, the State filed a petition pursuant to the Act seeking to have respondent adjudicated a sexually violent person and committed to the care and custody of the Illinois Department of Human Services (DHS). In 2006, a jury found respondent to be a sexually violent person under the Act based primarily upon the expert testimony of two clinical psychologists who diagnosed respondent with paraphilia not otherwise specified, sexually attracted to nonconsenting persons (paraphilia NOS, nonconsent), a congenital or acquired disorder that affects respondent's emotional or volitional capacity and predisposes him to commit future acts of sexual violence. The expert witnesses also concluded that respondent's mental disorders created a substantial probability that he would engage in future acts of sexual violence if released. Following a subsequent dispositional hearing, the trial

court ordered respondent committed to the DHS for institutional care in a secure facility until further order of the court. This court affirmed that judgment on direct appeal. See *In re Detention of Lieberman*, 379 Ill. App. 3d 585 (2007).

¶ 3    On October 29, 2007, the State filed a motion in the circuit court of Cook County asking the court to find that there was no probable cause to believe that respondent was no longer a sexually violent person and to order that respondent remain in a secure facility. The State's motion was filed pursuant to section 55 of the Act, which states that after a person has been committed to institutional care, the DHS is required to conduct an examination of that person's mental condition within 6 months of the initial confinement and again thereafter at least every 12 months. The purpose of the reexamination is to determine whether the person has made sufficient progress to be conditionally released or discharged. See 725 ILCS 207/55(a) (West 2008). Here, the State's motion for a finding of no probable cause was based upon the first annual (18-month) evaluation of respondent. Attached to the State's motion was the October 19, 2007, report of licensed clinical psychologist Dr. David Suire. According to Dr. Suire's report, respondent refused to participate in a clinical interview for purposes of his annual reexamination. The doctor's report also noted that respondent had maintained his innocence as to all the sexual offenses with which he had been charged or convicted and had refused to participate in any formal sexual offender treatment program while in the IDOC and while in the DHS treatment and detention facility. In his report, Dr. Suire stated that, to a reasonable degree of psychological certainty, respondent met the diagnostic criteria under the Diagnostic and Statistical Manual of Mental Disorders (DSM) for the following diagnoses: (1) paraphilia NOS, nonconsenting females; (2) cannabis abuse; (3) antisocial personality disorder; and (4) narcissistic personality disorder. Dr. Suire concluded that, in his professional opinion and to a reasonable degree of psychological certainty, it was substantially probable that respondent would engage in acts of sexual violence in the future. He therefore recommended that respondent continue to be found a sexually violent person and remain committed to the DHS treatment and detention facility for further secure care and sexual offender treatment until he demonstrated that he had made substantial progress in sexual offense treatment to be safely managed in the community on conditional release. Based upon Dr. Suire's report, the State maintained that there was no probable cause to warrant a full hearing on whether respondent should be conditionally released or discharged and asked the court to enter an order continuing respondent's confinement.

¶ 4    On July 15, 2008, respondent filed a petition for release from the custody of the DHS. Respondent claimed that he lacked the requisite mental abnormality to be confined in the DHS facility and that his mental health since the time of his civil commitment demonstrated that he was entitled to immediate discharge. Respondent sought two alternative forms of relief: immediate discharge pursuant to section 65 of the Act (725 ILCS 207/65 (West 2008)); and conditional release pursuant to section 60 of the Act (725 ILCS 207/60 (West 2008)).

¶ 5    The trial court appointed Dr. Eric Ostrov to conduct an independent examination of respondent and granted respondent's request for an examination by Dr. Chester Schmidt. Both experts prepared reports that were submitted to the court. On September 17, 2008, the

trial court held a probable cause hearing where the following evidence was presented.

¶ 6    Dr. Schmidt described himself as a "physician psychiatrist," a professor of psychiatry at Johns Hopkins University School of Medicine, and a founder and member of the sexual behavior consultation unit at Johns Hopkins Hospital. In 1995, he was appointed chairman of a work group for psychosexual disorders and paraphilias, and that group was one of a number of groups charged with revision of the DSM-III-R to the current DSM-IV. At that same time, Dr. Schmidt was a member of the American Psychiatric Association's (APA) board of trustees and he participated in the vote to approve his committee's recommendation regarding inclusion of the diagnosis of paraphilia NOS, nonconsent in the DSM.

¶ 7    In preparation for his work in this case, Dr. Schmidt reviewed, among other things, articles on civil commitment and the diagnosis of paraphilia NOS, the transcript from respondent's 2006 sexually violent person trial, police reports, IDOC mental health reports, respondent's DHS master treatment plans, and expert reports from Dr. Jacqueline Buck, Dr. Barry Leavitt, Dr. Suire, and Dr. Ostrov.[1] He also interviewed respondent for approximately two hours on April 6, 2008.

¶ 8    Dr. Schmidt rendered two opinions following his review of this information. First, that the diagnosis of paraphilia NOS, nonconsent does not exist in the DSM-IV. Second, that respondent does not have a disorder known as a paraphilia.

¶ 9    Although the State did not object to Dr. Schmidt's qualifications as an expert witness, specifically in regard to the DSM and sexual disorders, the State did object when he began to testify regarding his second opinion that respondent does not suffer from a paraphilia. Specifically, the prosecutor indicated that it was her understanding that the doctor was being offered "merely as an expert in diagnosis and sexual disorders and not the evaluation of sexual offenders." The trial court overruled the objection.

¶ 10   As to his first opinion, Dr. Schmidt explained that the DSM-IV contains a disorder called paraphilia not otherwise specified and that this section provides examples, such as necrophilia and zoophilia.[2] However, the disorder of paraphilia NOS, nonconsent is not contained within this section. The doctor further explained that in another section, the DSM states that the central diagnostic features of paraphilia include "recurrent, intense, sexually arousing fantasies, sexual urges or behaviors generally involving *** nonconsenting persons." Paraphilia NOS, however, cannot be combined with the diagnostic feature of "nonconsenting persons" in order to conclude that the DSM contains a disorder called paraphilia NOS, nonconsent. There is a formal process by which diagnoses are included in

---

[1]Dr. Buck and Dr. Leavitt were the State's expert witnesses at the 2006 trial to determine whether respondent was a sexually violent person.

[2]Necrophilia is defined as an "obsession with and usually erotic interest in or stimulation by corpses," while zoophilia is defined as "an erotic fixation on animals that may result in sexual excitement through real or fancied contact." Merriam-Webster Medical Dictionary (2010), *available at* http://www.merriam-webster.com/medlineplus/necrophilia; http://www.merriam-webster.com/medlineplus/zoophilia.

the DSM and that process has not taken place with paraphilia NOS, nonconsent. Moreover, a mental health professional cannot create a diagnosis based on his or her own personal interpretation of the DSM. Rather, the use of only officially recognized diagnoses is essential for purposes of treatment, research, and the "integrity of the legal system itself." Further, rape is specifically dealt with in other sections of the DSM. Rapes that contain a paraphilic element are covered in the paraphilia section of the DSM on sexual sadism, which lists rape as a behavior sometimes associated with sadistic behavior. Rapes that do not contain a paraphilic element are found in a section called "other conditions that may be the focus of clinical attention." The conditions and behaviors in this section are "of interest to mental health professionals" but "do not rise to the threshold of being mental illnesses in and of themselves." This section of the DSM contains "V-codes," and the contingency of rape with no paraphilic element is covered in the section of V-codes entitled "sexual abuse of adults."

¶ 11    In 1986, Dr. Schmidt was the chairman of a committee that was convened by the APA to consider whether the disorder of paraphilia NOS, nonconsent should be included in the DSM-III. The committee voted against recommending inclusion of that diagnosis in the DSM for two reasons. First, there was "no scientific support for the diagnosis" but instead only "expert opinion[,] which is one of the lowest forms of research to support anything." Second, various organizations raised the concern that including the diagnosis in the DSM could be misused as an insanity defense in rape trials. The committee's recommendation was submitted to the APA board of trustees, of which Dr. Schmidt was also a member, and the board voted to not include the diagnosis in the DSM-III-R. During his later work from 1995 to 2000 on the revision of the DSM-III-R to the DSM-IV, there were no requests that the disorder be included in that edition of the DSM. To Dr. Schmidt's knowledge, there is no current reconsideration of this decision, which meant that "the field in general is essentially satisfied with the *** diagnostic format that exists within the DSM-IV."

¶ 12    Dr. Schmidt's second opinion was that respondent does not suffer from any type of paraphilia.[3] Dr. Schmidt reviewed the 15 evaluations of respondent conducted during the 20 years he was in the IDOC, none of which diagnosed respondent with any type of paraphilia. Dr. Schmidt testified that the mental health professionals who evaluated respondent would have been required to indicate any such diagnosis on their evaluation forms and that it was "hard to believe that any mental health professional worth his or her salt given the circumstances that he was in jail for raping" would not have found paraphilia if it in fact existed.

¶ 13    Dr. Schmidt also stated that respondent's psychosexual history "up to the time of the 1979 crimes" did not reveal paraphilic urges or behaviors but, rather, "a fairly normal heterosexual development during" his adolescent years. Moreover, based upon respondent's self-reported information, Dr. Schmidt saw no evidence of recurrent paraphilic urges or

---

[3]Paraphilia is defined as "a pattern of recurring sexually arousing mental imagery or behavior that involves unusual and especially socially unacceptable sexual practices (as sadism, masochism, fetishism, or pedophilia)." Merriam-Webster Medical Dictionary (2010), *available at* http://www.merriam-webster.com/medlineplus/paraphilia.

fantasies. With respect to paraphilic behavior, there were no reported behaviors of any coercive sexual activity with either female staff or prisoners. If respondent had paraphilia, it would be expected that he would have found an outlet to act out that paraphilia, including within the prison's homosexual community. This would be true even though respondent was otherwise a heterosexual.

¶ 14    Dr. Schmidt also believed that respondent's symptom severity and functional capacity since he entered the DHS treatment and detention facility in 2000 did not indicate that he suffered from paraphilia NOS, nonconsent. Specifically, Global Assessment of Functioning (GAF) scores, which are determined by the DHS treatment team and which can range from 1 (worst) to 100 (best), are a measure of a person's symptom severity and level of functioning. Dr. Schmidt testified that respondent's current GAF score indicates that his symptom severity and functional capacity are "pretty close to normal at this time." According to Dr. Schmidt, respondent's GAF scores from 1999 to 2005 were in the area of 45, which indicates serious symptoms or impairment. During his three most recent reviews, respondent's treatment team gave him a GAF score of 71. This score indicates that symptoms are present but are "transient and expectable reactions to psycho-social stressors" and that respondent has "no more than slight impairment in social, occupational, or school functioning." Ultimately, assuming that respondent suffered from a paraphilia when he was given that diagnosis in 1999 or 2000, the upward trending of his GAF score indicated to Dr. Schmidt that those who have observed respondent believe that he has dramatically improved in terms of symptom severity and functional capacity.

¶ 15    Dr. Schmidt explained that respondent having committed multiple rapes did not establish that he had a mental disorder. First, rape is not in itself a mental disorder or necessarily paraphilic, and only a small fraction of rapists suffer from paraphilia. Second, Dr. Schmidt believed that respondent's pre-rape history may be relevant to explaining respondent's commission of multiple rapes. According to the materials Dr. Schmidt reviewed, respondent reported that, as a teenager, he had a sexual experience in which a woman that he was attempting to have intercourse with "initially resisted, resisted, and then allowed, then said yes." Respondent indicated that this was "a very important experience" because as a result he believed at the time that "when women say no they really meant yes." Respondent also reported that his first rape was very sexually gratifying. According to Dr. Schmidt, at that time respondent was acting selfishly for his own sexual gratification and had no regard for the law. When respondent was apprehended and then released on bond, he committed additional rapes because he thought that "the law had no teeth" and that he "was immune from the law." Dr. Schmidt opined that these experiences provide "as plausible an explanation as maybe we'll ever get from the facts of the case."

¶ 16    On cross-examination, Dr. Schmidt testified that he has never been a member of any professional organization whose focus is the evaluation and treatment of sexual offenders and that, prior to respondent's case, he had never been qualified as an expert in a sexually violent persons case or in the evaluation of sexual offenders. Dr. Schmidt acknowledged that he made an application to be on the Illinois Sex Offender Management Board but that he was not accepted because he did not meet the "technical requirements with regard to the number

of treatment of sexual offenders."[4] Other than respondent, Dr. Schmidt has never evaluated a person who has been found to be a sexually violent person by the laws of any state. The doctor testified, however, that he has evaluated people who are convicted sexual offenders and who have been charged with sexual offenses. Dr. Schmidt testified that he did not review the original police reports or the transcripts from the trials resulting in respondent's rape convictions. He also acknowledged that he did not speak to any of the treating staff at the DHS facility where respondent has been detained and that the only DHS information he reviewed was that provided by respondent's counsel. Dr. Schmidt testified that he did not "know anything" about commitment laws for sexually violent persons until the present case and that he therefore had no personal opinion of them.

¶ 17    Dr. Schmidt acknowledged that the diagnosis of paraphilia NOS, nonconsent is "widely used" and that that there has been an ongoing debate in the psychiatric field over the last 20 years as to the validity of the diagnosis of paraphilia NOS, nonconsent. Dr. Schmidt believed that paraphilia NOS, nonconsent is not a valid disorder despite reports suggesting that there is "apparent widespread acceptance" of the diagnosis "by forensic experts in the field." When asked if every diagnosis in the DSM is universally accepted by every clinic that uses the DSM, Dr. Schmidt responded that "all of us have some objections or fault with diagnoses, but the diagnoses are universally used by the medical insurance industry and are strictly required to be used for reimbursement, if for no other reason, not to mention science." They are also used for diagnosis, for managing patients, and for research. "It is absolutely essential that there be a consensus with regard to the diagnosis, irrespective of any difficulties or problems any professional has with any aspect of the DSM-IV."

¶ 18    Respondent testified on his own behalf that since he has been committed to the custody of the DHS, he has married, founded a "facility band," taken computer classes, obtained an Occupational Safety and Health Administration (OSHA) certification, and participated in the "institutional newsletter." Respondent also testified that residents at the DHS detention facility are assigned to various status levels based upon their behavior and that, like most others, he began in "admission status." For the last several years, he has been in "intermediate A status," which is the "highest status attainable." In order to attain that status, respondent was required to comply with the institutional rules and to be involved in the "responsible living program," which requires completion of certain tasks and jobs in order to "demonstrate that you are able to accept responsibility and eventually reintegrate yourself into the community."

¶ 19    Respondent testified that since his commitment he has refused to participate in the DHS treatment and detention facility's formal sexual offender treatment program. Participation in the program requires admission that a person lacks volitional control and, according to respondent, "I don't lack control of myself." Respondent also has not participated in formal

---

[4]We believe Dr. Schmidt could not submit an application to be a member of the Illinois Sex Offender Management Board. Board members are appointed to the position. See generally 20 ILCS 4026/1 *et seq.* (West 2010). However, a person can be approved as an evaluator by the Board. See, *e.g.*, 20 ILCS 4026/16 (West 2010); 725 ILCS 207/55, 60, 65 (West 2008).

treatment because he does not want to listen to fellow detainees describe the crimes they have committed. Respondent testified that, "I don't need [therapists] to tell me how to think," and that he "knows what is right and what is wrong." Respondent has, however, spoken openly to his primary therapist at the detention center.

¶ 20        Respondent further testified that he has been in physical proximity to women in the detention center, including therapists, but that he has not had any behavioral incidents. According to respondent, if he was conditionally released, he would live with his wife and that an attorney has offered him employment in a law firm. Respondent also indicated that if released, he would participate in drug and alcohol testing as well as counseling or therapy.

¶ 21        On cross-examination, respondent testified that until recently he had denied committing the rapes of which he was convicted. In early 2008, Dr. Eric Ostrov was appointed by the court to evaluate respondent and at that time respondent admitted that he was in fact guilty of those crimes. Respondent testified, however, that it was "not exactly" true that he had been denying his guilt for the past 28 years. He explained that in 1983, "Judge Berkos" took respondent, respondent's father, a public defender and a prosecutor into his chambers and told respondent that if he lied to the judge he would never "see the light of day again." Respondent then took responsibility for his crimes and his subsequent denials were based in part on "strategic advice" from his attorneys. Respondent further explained that he admitted his guilt to Dr. Ostrov because after his 2006 sexually violent person trial, he "didn't have any rights that had to be protected." Respondent concluded by testifying that he has taken responsibility for his actions and learned from his mistakes and that he is not the same person today that he was at the age of 19 and 20 when he committed the rapes.

¶ 22        The parties stipulated that if called as a witness, Dr. Mark Babula would testify that he was respondent's primary therapist at the DHS treatment facility and that any contact he had with respondent did not constitute sexual offender treatment. Dr. Babula would further testify that respondent has not participated in sexual offender treatment at the DHS treatment and detention facility.

¶ 23        The State's first witness was Dr. Ostrov, who testified that he received a Ph.D. in clinical psychology and a J.D. from the University of Chicago and is board certified by the American Board of Professional Psychology. Dr. Ostrov is also on the Illinois Sex Offender Management Board approved list of evaluators. Since the sexually violent persons (SVP) law was passed in 1998, Dr. Ostrov has conducted over 100 evaluations of approximately 40 people who were accused of being sexually violent persons pursuant to court order.

¶ 24        Dr. Ostrov diagnosed respondent, within a reasonable degree of psychological certainty, with paraphilia NOS, nonconsent and a personality disorder with antisocial and narcissistic features. These disorders, including paraphilia, predispose respondent to commit future acts of sexual violence, and therefore Dr. Ostrov did not recommend that respondent be conditionally released.

¶ 25        Dr. Ostrov testified that he used the DSM when he evaluated respondent and that, under certain circumstances, paraphilia NOS, nonconsent is an appropriate diagnosis. Dr. Ostrov was aware that some experts believe that the diagnosis is inappropriate because it is not specifically enumerated in the DSM's examples of paraphilia NOS, and because of concerns

that it could be used to exculpate rapists. However, Dr. Ostrov did not agree with the principle that if a diagnosis is not contained in the DSM it is not a widely recognized diagnosis. The examples given in the DSM of paraphilia NOS are "simply examples" that are "not meant to be exhaustive." Dr. Ostrov believed that "nonconsenting per se" is not listed as an example under the paraphilia NOS category due to the concern that it could be used to exculpate a rapist. Dr. Ostrov further explained that the DSM is a standard reference work for mental health professionals so they have a common reference point when they use terminology in the mental health field. Dr. Ostrov acknowledged that not all rapists have a paraphilia but this did not mean that "there are not other persons who have sex with nonconsenting persons who do have a paraphilia."

¶ 26       Dr. Ostrov further testified that the DSM contains guidance for a diagnosis of paraphilia NOS, nonconsent. The DSM states that the person must have "recurrent and intense" sexually arousing fantasies, sexual urges, or behaviors. The DSM then gives examples of the objects of these fantasies, urges or behaviors, including "children or other nonconsenting persons." The DSM provides additional criteria, such as a recurrence of the fantasies, urges or behaviors over a period of six months, an age requirement, and a requirement that it "has to have caused clinically significant distress or impairment in social, occupational, or other important areas of functioning."

¶ 27       Dr. Ostrov's paraphilia diagnosis was informed by several aspects of respondent's behavior. According to Dr. Ostrov, the police reports, convictions, and respondent's own testimony showed "repeated instances of non-consensual sex directed to different women over a period of time longer than six months." Moreover, these instances of nonconsensual sex caused respondent clinically significant distress or impairment in that they "caused him enormous impairment in social and occupational and other areas of functioning." Further, respondent was over 16 years old at the time of the rapes and his victims were not children.

¶ 28       Dr. Ostrov did not believe respondent's position that he committed the rapes "because he was basically young, ignorant, stupid *** and really didn't understand the repercussions of his behavior." The police reports revealed that respondent was often very concerned about being apprehended. Thus, respondent's actions were not simply "youthful caprice" but more akin to "driven behavior" in that "despite his fear, the drivenness overcame that fear" and led him to commit rapes anyway.

¶ 29       Dr. Ostrov disagreed that respondent has taken full responsibility for his past actions. For example, when respondent was asked how his potential release might affect his victims, he answered in a "cavalier" manner that, to his knowledge, none of the victims remained in the area. This response showed a lack of empathy toward his victims because it failed to address that his victims would almost certainly be concerned about his release, regardless of where they currently lived, and because some of those victims might have family members still living in the area.

¶ 30       In arriving at his opinions, Dr. Ostrov also considered respondent's statements that he has been on good behavior and has not engaged in nonconsensual intercourse while detained in the IDOC and the DHS treatment and detention facility. According to Dr. Ostrov, some people act out in prison and some do not. In the case of those who do not, this may be

because those persons have changed or it may be because they do not "have the opportunity to commit the crime they are predisposed to commit." In respondent's case, there is no past instance of him having an interest in men so his access to other prisoners was not relevant. Moreover, although respondent claimed to have access to women while he has been detained, it was "certainly not the kind of access he had when he was out in the community" because "there was always some level of surveillance." Dr. Ostrov further explained that respondent's claim that he has not "acted out sexually" while he has been detained must be viewed in context of the fact that he has not been around his preferred sexual stimuli. People with paraphilia act much differently when they are aroused by being in contact with their preferred sexual stimuli than they do when that stimuli is not available. When someone with paraphilia is aroused, his ability to control himself and to consider the consequences of his actions is "markedly" decreased.

¶ 31    Dr. Ostrov also administered an actuarial called the "Static-99," and respondent's score indicated that he posed a high risk of reoffending. Dr. Ostrov further believed respondent was at a high risk of reoffending because he has not shown an interest in participating in formal sexual offender treatment and because he has not had the benefit of completing that treatment, which has been empirically shown to decrease the risk that a person will sexually reoffend. Dr. Ostrov considered respondent's statement that he did not attend therapy because he did not want to listen to the stories of other sexual offenders. However, one aspect of treatment is taking responsibility for your actions and if respondent is not willing to listen to others discuss their past crimes, Dr. Ostrov questioned how respondent could reflect on the crimes he has committed.

¶ 32    Dr. Ostrov acknowledged that respondent's age (48 years old) would have some impact on his likelihood of recidivism but "not a very significant impact" because the likelihood of recidivism "doesn't reach a very significant level of decrease until about age 60." The likelihood of recidivism does decrease as a person approaches 50 years old, however, and therefore respondent posed a "moderately severe risk," rather than a severe risk, of committing a future act of sexual violence. Dr. Ostrov characterized this as an "appreciable risk" such that he did not believe respondent was an appropriate candidate for conditional release. According to Dr. Ostrov, the question is whether respondent has decreased that risk to the point that it would be tolerable for him to be on conditional release and, other than respondent's age and the fact that he has not acted out sexually while incarcerated or detained, Dr. Ostrov did not see evidence that respondent has significantly decreased the risk that he would sexually reoffend.

¶ 33    The State's next witness was Dr. Suire, who performs evaluations relating to sexually violent person commitments for the DHS. Dr. Suire is a licensed clinical psychologist and has worked in the past at the Wisconsin sexually violent person facility, at a Texas state mental health facility where he performed evaluations relating to competency to stand trial, and as clinical director of the Missouri Sexual Offender Program. The doctor has performed approximately 120 evaluations in Illinois pursuant to the Act.

¶ 34    Dr. Suire evaluated respondent in 2007 and prepared a report pursuant to the Act. Dr. Suire diagnosed respondent, to a reasonable degree of psychological certainty, with "paraphilia not otherwise specified, sexually attracted to nonconsenting person

nonexclusive," cannabis abuse, antisocial personality disorder, and narcissistic personality disorder. Dr. Suire used the DSM to arrive at these diagnoses and testified that he was aware of the disagreement regarding the diagnosis of paraphilia NOS, nonconsent. However, this did not prevent him from diagnosing respondent with the disorder because "there is probably nothing in the field of psychology that doesn't have some degree of disagreement." The disagreement over the disorder is primarily due to "political factors" and the general belief that not all rapists have a paraphilia.

¶ 35    Dr. Suire testified that respondent met all of the diagnostic criteria for this diagnosis. He committed or attempted to commit a large number of rapes within a 10-month period, which satisfied the 6-month requirement and spoke to the intensity of respondent's urges. Because respondent refused to be interviewed, Dr. Suire could not speak to respondent's fantasy life. However, the doctor stated that "its difficult for me to imagine that you can have this type of pattern without having fantasies attached to it." Finally, the fact that respondent has spent most of his adult life either in prison or a secure commitment facility spoke to the difficulty his urges, fantasies or behaviors have caused him.

¶ 36    Dr. Suire also considered the nature of the rapes that respondent committed and the fact that he posed as a plumber to gain access to his victims. The doctor explained that not all rapes are due to paraphilic urges and therefore it is important to determine if the driving force behind the rape-type behavior is an underlying specific urge toward nonconsenting sexual contact. In making this determination, considerations include the use of a kind of "stereotype repetitious pattern," whether the rape-type behaviors were occurring while the person had access to consenting sexual partners, the frequency of the acts of sexual misconduct, and whether the person was committing other crimes while committing rapes.

¶ 37    Dr. Suire also performed a risk assessment as part of his evaluation of respondent. The first part of the assessment consisted of file review, information gathering, and his attempt to interview respondent. The second step involved the use of actuarial instruments to attain a "baseline estimate of the risk." In this case, Dr. Suire used the Static-99 and the Minnesota Sex Offender Screening Tool Revised (MNSOST-R), both of which are well-accepted actuarials. Respondent scored in the "high-risk" on the Static-99 and in the "refer risk" range on the MNSOST-R. The final step in performing a risk assessment involved consideration of "aggravated" and "protective" factors, which can increase or decrease a risk level above or below that as indicated by the actuaries. Respondent had a "fairly large number" of aggravating factors, including deviant sexual arousal, two personality disorders, a high score on the "Harris psychopathy checklist, which, while not a specific predictor of sexual offense recidivism, is correlated with an elevated risk," and a high score on the violence risk assessment guide, which also correlates with an elevated risk. The three main protective factors Dr. Suire considered were treatment progress, medical condition, and age. Respondent did not have any medical conditions that were of any relevance to his risk of committing a sexual offense. Age is negatively correlated with the risk of sexual recidivism but, with respect to high-risk offenders such as respondent, Dr. Suire did not think that "we are at the point where we can say that with any level of confidence." Therefore, the doctor did not consider respondent's age to be a significant protective factor. Finally, respondent has never participated in core sexual offender treatment, which can "substantially reduce the

-11-

risk of sexually reoffending." Dr. Suire did not believe that this risk was reduced by respondent's participating in "ancillary treatment-type" programs at the DHS treatment and detention facility.

¶ 38     Based upon his consideration of all these factors, Dr. Suire opined that, to a reasonable degree of psychological certainty, it is substantially probable that respondent will commit new acts of sexual violence, that he remains a sexually violent person, and that he has not made sufficient progress to allow him to be safely managed in the community.

¶ 39     Following closing arguments, the trial court denied respondent's petition and found that there was not probable cause to warrant a hearing on the issues of whether respondent remained a sexually violent person or whether it was not substantially probable that respondent would engage in acts of sexual violence if released. The court acknowledged disagreement among mental health professionals as to the validity of the diagnosis of paraphilia NOS, nonconsent and stated that the question could not be answered simply by testimony that the disorder is not specifically listed in the DSM. The court then stated that Dr. Schmidt had "impressive credentials" but that there was something "very troubling about his testimony and his evaluation of sexually violent persons, which this is the first, apparently, he's done." The court noted that Dr. Schmidt's explanation as to why respondent committed multiple rapes if he did not suffer from a mental disorder, specifically his testimony regarding respondent having had intercourse at a young age with a girl who initially told him no and that having led him to believe that no meant yes, "was absolutely, totally, completely absurd, quite frankly." On the other hand, the court stated that Dr. Suire and Dr. Ostrov were "quite credible" witnesses. The court found that the diagnosis of paraphilia NOS, nonconsent was a mental disorder that satisfied the requirements of the Act. The court further noted that although it was "not impressed with the credibility of [respondent's] testimony," the evidence did show that respondent had made "an improvement to some extent." However, the court observed that respondent had refused to participate in formal sexual offender treatment, claiming he did not need it, and that "when you add that to the whole mix of what I observed," there was not probable cause to believe that respondent had made sufficient progress to be conditionally released or discharged. This appeal followed.

¶ 40     The respondent in this case filed a petition seeking either a discharge or a conditional release. When a petition for discharge is filed, the court must set a probable cause hearing to determine whether facts exist that warrant a hearing on whether the respondent remains a sexually violent person. 725 ILCS 207/65(b)(1) (West 2008). If the court finds that there is probable cause to believe that the respondent is no longer a sexually violent person, it must set a hearing on the issue. 725 ILCS 207/65(b)(2) (West 2008). When a petition for conditional release is filed, the court must hold a hearing to determine whether probable cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if released or conditionally discharged. 725 ILCS 207/60(c) (West 2008). Under section 60(c) of the Act:

     "Within 20 days after receipt of the petition, upon the request of the committed person or on the court's own motion, the court may appoint an examiner having the specialized knowledge determined by the court to be appropriate, who shall examine

the mental condition of the person and furnish a written report of the examination to the court within 30 days after appointment. The examiners shall have reasonable access to the person for purposes of examination and to the person's past and present treatment records and patient health care records. If any such examiner believes that the person is appropriate for conditional release, the examiner *shall* report on the type of treatment and services that the person may need while in the community on conditional release. The State has the right to have the person evaluated by experts chosen by the State. Any examination or evaluation conducted under this Section *shall* be in conformance with the standards developed under the Sex Offender Management Board Act and conducted by an evaluator approved by the Board. The court shall set a probable cause hearing as soon as practical after the examiners' reports are filed. The probable cause hearing shall consist of a review of the examining evaluators' reports and arguments on behalf of the parties. If the court determines at the probable cause hearing that cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release, the court shall set a hearing on the issue." (Emphasis added.) Pub. Act 96–1128 (eff. Jan. 1, 2011) (amending 725 ILCS 207/60(c) (West 2008)).[5]

Respondent carries the burden of proof under either standard. See *In re Detention of Stanbridge*, 408 Ill. App. 3d 553 (2011). We review the ultimate question of whether respondent established probable cause *de novo*. See *State v. Watson*, 595 N.W.2d 403 (Wis. 1999).

¶ 41    In *Hardin*, 238 Ill. 2d at 36, our supreme court considered the quantum of evidence necessary to support a sexually violent person commitment petition at a probable cause hearing. The respondent in *Hardin* had been convicted of various sexually violent offenses and, immediately prior to his latest scheduled mandatory supervised release period, the State filed a petition seeking to commit the respondent under the Act. The petition was supported by a written report by a licensed clinical psychologist who determined that the respondent met the criteria for civil commitment as a sexually violent person. That psychologist was the only witness called at the subsequent probable cause hearing. He testified that his opinions were based on materials customarily relied on by evaluators of sexually violent persons. The doctor testified that the respondent suffered from the mental disorders of paraphilia, not otherwise specified, nonconsenting persons, and personality disorder. Left untreated, these diseases made respondent likely to reoffend, a conclusion supported by the respondent's test results and "repeated rejection of offers for sex offender treatment while in prison." *Hardin*, 238 Ill. 2d at 37.

¶ 42    The trial court found no probable cause to believe that the respondent was a sexually

---

[5]Although there have been minor changes to the statute since respondent filed his petition for release in 2008, the version of the statute applicable to these proceedings also requires that any examination "conducted under this [s]ection shall be in conformance with the standards developed under the Sex Offender Management Board Act and conducted by an evaluator approved by the Board." 725 ILCS 207/60(c) (West 2008).

violent person who was likely to reoffend and therefore ordered that he be released and placed on mandatory supervised release. The trial court agreed with the respondent that his current convictions alone could not be used to meet the statutory criteria and found that no testimony had been presented as to any behavior by the respondent that would give probable cause to believe that he suffered from a mental disorder. *Hardin*, 238 Ill. 2d at 37-38. The court also found that there was no basis for the State's petition other than respondent's past convictions because the State had presented no evidence that respondent continued to have "an unusual interest in teenage girls." *Hardin*, 238 Ill. 2d at 38. The State appealed the trial court's finding of no probable cause and the appellate court reversed that finding and remanded for further proceedings. *Hardin*, 238 Ill. 2d at 38.

¶ 43    On appeal, our supreme court considered "whether the appellate court gave sufficient deference to the trial court's credibility and probable cause determinations in reversing the finding of no probable cause to believe respondent is a SVP." *Hardin*, 238 Ill. 2d at 43. The court began by noting that to support a finding of probable cause in a SVP proceeding, the evidence must establish that the subject of the petition "has been found guilty, delinquent, or not guilty by reason of insanity, mental disorder, or mental defect of a sexually violent offense," "has a mental disorder," and "is a danger to others because the mental disorder causes a substantial probability that the subject will commit acts of sexual violence." (Internal quotation marks omitted.) *Hardin*, 238 Ill. 2d at 43 (quoting 725 ILCS 207/5(f), 15(b) (West 2006)).

¶ 44    The court resolved the question of the proper quantum of evidence in a probable cause hearing by adopting the evidentiary standard established by the Wisconsin Supreme Court in *Watson*. It observed that in *Watson*, the court addressed the quantum of evidence needed to support a finding that a respondent is a sexually violent person under the Wisconsin sexually violent person statute. *Hardin*, 238 Ill. 2d at 46 (noting that the Wisconsin SVP statute is substantially similar to the Illinois SVP statute). The court in *Watson* explained that "the purpose of a probable cause hearing in a SVP proceeding is 'to show that there is a substantial basis for going forward with the commitment, when it is virtually certain that if probable cause is found, the person will remain in custody until' the end of the proceeding, thus providing 'a barrier to improvident or insubstantial commitment petitions which are not likely to succeed on the merits.' " *Hardin*, 238 Ill. 2d at 46-47 (quoting *Watson*, 595 N.W.2d at 418). Further, the *Watson* court noted that "a probable cause hearing *** is merely a 'summary proceeding to determine essential or basic facts as to probability' and 'is concerned with the practical and nontechnical probabilities of everyday life in determining whether there is a substantial basis for bringing the prosecution and further denying the accused his right to liberty.' " (Internal quotation marks omitted.) (Emphasis omitted.) *Hardin*, 238 Ill. 2d at 47 (quoting *Watson*, 595 N.W.2d at 420).

¶ 45    Our supreme court concluded its review of *Watson* by observing:

"In a SVP probable cause hearing, the *Watson* court merely required the State to 'establish a plausible account on each of the required elements to assure the court that there is a substantial basis for the petition.' *Watson*, 227 Wis. 2d at 205, 595 N.W.2d at 420. In making that determination, the trial judge must consider 'all reasonable inferences that can be drawn from the facts in evidence.' *Watson*, 227 Wis. 2d at 205,

-14-

595 N.W.2d at 420. The requirement that the evidence supporting each element be 'plausible' indicates that trial judges need not ignore blatant credibility problems, but the *Watson* court stressed that this type of hearing was 'not a proper forum to choose between conflicting facts or inferences.' *Watson*, 227 Wis. 2d at 205, 595 N.W.2d at 420. Consequently if after hearing the evidence, the trial judge decides the probable cause determination is supported by a reasonable inference, the cause should be held over for a full trial." (Emphasis omitted.) *Hardin*, 238 Ill. 2d at 48.

¶ 46 Applying these principles, our supreme court found that the trial court did not apply the correct evidentiary standards in finding that the State had failed to establish probable cause. *Hardin*, 238 Ill. 2d at 48. Specifically, the trial court "relied on a full and independent evaluation of [the State's expert's] credibility and methodology" and "weighed the conflicting evidence presented during both the direct and cross-examination of the State's sole witness, *** as well as delving extensively into the credibility of his expert testimony." *Hardin*, 238 Ill. 2d at 48-49, 53. The court stated that these factors "are well beyond the scope of the limited inquiry in a probable cause hearing" and that "[a]s long as the State presented enough evidence at the hearing to 'establish a plausible account on each of the required elements,' providing 'a substantial basis for the petition' when all reasonable factual inferences are considered, probable cause is established." *Hardin*, 238 Ill. 2d at 49 (quoting *Watson*, 595 N.W.2d at 420).

¶ 47 Our supreme court also found that the State presented testimony on each of the three required elements from its expert witness, who "unquestionably had extensive experience as a clinician, a SVP evaluator, and an expert witness in SVP cases." *Hardin*, 238 Ill. 2d at 49. The State's expert diagnosed respondent with two mental disorders based upon his interview with respondent, his review of the respondent's criminal records and master file, and the diagnostic criteria of the DSM-IV. The court noted that the State was not required to show more than a "plausible account" on this element and that, at a probable cause hearing, "the court should not attempt to determine definitively whether each element of the State's claim can withstand close scrutiny as long as some 'plausible' evidence, or reasonable inference based on that evidence, supports it." *Hardin*, 238 Ill. 2d at 51-52. The court found that the testimony of the State's expert on the DSM-IV criteria and the evidentiary bases for his diagnosis were "adequate to survive that relatively low threshold standard." *Hardin*, 238 Ill. 2d at 52. Regarding the requirement that the respondent be substantially likely to reoffend, the court addressed the respondent's concern that the State could use his past convictions in every case to claim that he had a mental disorder and that it was substantially probable that he would engage in future acts of sexual violence. It observed:

"Although probable cause deals with practical probabilities rather than absolute certainties, more is required of the State than mere argument. The State must provide actual evidence, even if based at least in part on behaviors and traits reflected in prior convictions, to support a finding that the respondent meets each of the three probable cause elements. That evidentiary burden includes a showing that the respondent is substantially likely to re-offend based on the presence of a mental disorder." *Hardin*, 238 Ill. 2d at 52-53.

The court found that this element was satisfied by the testimony of the State's expert as to

the respondent's scores on psychological tests and his unique type of victims as support for his opinion that the respondent presented a substantial risk of reoffending. *Hardin*, 238 Ill. 2d at 53. Thus, the court found that the State had met its burden and it therefore upheld the appellate court's reversal of the trial court's finding of no probable cause. *Hardin*, 238 Ill. 2d at 54.

¶ 48    Respondent asserts that the evidentiary standards set forth in *Hardin* govern the trial court's probable cause determination in this case. Respondent also asserts that the trial court exceeded the scope of the inquiry set forth in *Hardin* because it "engaged in a full and independent evaluation of the expert witnesses' testimony and an in-depth credibility analysis." Finally, respondent claims that when the proper evidentiary standard is applied, Dr. Schmidt's testimony established that probable cause exists to discharge or conditionally release respondent and that the case should be remanded to the trial court for a full evidentiary hearing.

¶ 49    Under *Hardin*, respondent was required to establish a "plausible account" on each of the required elements. With respect to a petition for conditional release, this includes evidence that "it is not substantially probable that [respondent] will engage in acts of sexual violence if on release or conditional release." 725 ILCS 207/60(c) (West 2008). For purposes of a petition for discharge, respondent was required to provide evidence that he is no longer a sexually violent person. See 725 ILCS 207/65(b)(1) (West 2008). The Act defines a sexually violent person as an individual who "has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2008).

¶ 50    Initially, it must be pointed out that after a careful review of the record and sections 60(b)(1) and (c) of the Act, it is clear that Dr. Schmidt did not and could not offer any opinion concerning a conditional release for two reasons. First, Dr. Schmidt never provided the statutorily required report or any testimony whatsoever on "the type of treatment and services that the person may need while in the community on conditional release." 725 ILCS 207/60(c) (West 2008). Second, Dr. Schmidt is not and has never been an "evaluator approved by the [Illinois Sex Offender Management] Board." 725 ILCS 207/60(c) (West 2008).

¶ 51    Additionally, and again contrary to the requirements of the Act, Dr. Schmidt never offered any expert opinion on two critical elements. First, although Dr. Schmidt testified that respondent does not suffer from a paraphilia, he offered no testimony that respondent does not suffer from any mental disorder as defined by the Act. Second, Dr. Schmidt did not testify that it was not substantially probable that respondent would engage in acts of sexual violence if released. Dr. Schmidt never testified that respondent was a suitable candidate for discharge or conditional release. In fact, none of the testimony he offered was to a reasonable degree of medical, psychological, or psychiatric certainty. Although we recognize that there is no magic to the phrase "to a reasonable degree of medical, psychological, or psychiatric certainty," an expert's testimony must reveal that his opinions are "based upon specialized knowledge and experience and grounded in recognized" medical, psychological, or psychiatric thought. See *Dominguez v. St. John's Hospital*, 260 Ill. App. 3d 591, 595 (1994).

-16-

Respondent's failure to offer expert testimony on the required elements alone justifies the trial court's finding of no probable cause. In contrast to the omissions in Dr. Schmidt's testimony, the State presented the testimony of two expert witnesses who testified that respondent suffers from a mental disorder that makes it substantially probable that he would commit acts of sexual violence if released. These witnesses also testified that respondent had not significantly reduced his risk of sexually reoffending or made sufficient progress to be safely managed in the community, that he remained a sexually violent person, and that he should not be conditionally released or discharged.

¶ 52    Respondent nevertheless asserts that he established probable cause to believe that the "alleged disorder" upon which his commitment rests does not exist. Dr. Schmidt testified that the diagnosis of paraphilia NOS, nonconsent is not contained in the DSM. On the other hand, Dr. Ostrov and Dr. Suire testified that the diagnosis is valid and finds support in the DSM, even though it is not listed as a specific disorder in that manual. In dismissing respondent's petition, the trial court acknowledged the "disparity of opinions" on the issue but stated that the question of whether the diagnosis could justify civil commitment under the Act could not be resolved by the fact that the diagnosis is not specifically listed in the DSM. The court ultimately concluded that the diagnosis could support respondent's continued civil commitment.

¶ 53    Although respondent argues that the trial court's ruling was error, he provides no authority in which a court has found that paraphilia NOS, nonconsent does not support a finding that a person is a sexually violent person under the Act because that disorder is not specifically listed in the DSM or because not all mental health experts agree on the validity of the diagnosis. He cites no authority in which a court has found that due process is violated when a person is committed under a sexually violent person statute based upon a mental disorder that is not specifically listed in the DSM. Although respondent claims that no Illinois court has ruled that paraphilia NOS, nonconsent exists in the DSM, the ultimate inquiry is not whether the diagnosis exists in the DSM. Rather, the ultimate inquiry is whether respondent continues to suffer from a mental disorder that creates a substantial probability that he will engage in acts of sexual violence if released. Indeed, the Act does not require that the mental disorder be listed specifically in the DSM in order for the disorder to support a sexually violent person finding. See 725 ILCS 207/1 *et seq.* (West 2008); *McGee v. Bartow*, 593 F.3d 556, 576 (7th Cir. 2010) (where a committed person challenged his commitment under the Wisconsin sexually violent person statute on the ground that paraphilia NOS, nonconsent is not contained in the DSM, the court rejected that claim and stated, "[t]he Supreme Court's cases on this point teach that civil commitment upon a finding of a 'mental disorder' does not violate due process even though the predicate diagnosis is not found within the *** DSM"). Further, the very diagnosis that Dr. Schmidt challenges as nonexistent is the diagnosis given by the expert witness in *Hardin*, who the court observed "unquestionably had extensive experience as a clinician, a SVP evaluator, and an expert witness in SVP cases." *Hardin*, 238 Ill. 2d at 49. Additionally, the diagnosis of paraphilia NOS, nonconsent has been the basis for numerous probable cause or sexually violent person findings in this state and other jurisdictions outside of this state. See, *e.g.*, *Hardin*, 238 Ill. 2d at 49-50; *Stanbrige*, 408 Ill. App. 3d at 554; *In re Commitment of Sandry*, 367 Ill. App.

3d 949, 953 (2006); *Watson*, 595 N.W.2d at 420 (diagnosis of paraphilia supported finding of probable cause under Wisconsin SVP statute).

¶ 54     We disagree with respondent's assertions that the trial court improperly rejected Dr. Schmidt's testimony and credentials and that the disparity of opinions on the issue, including the opinion of Dr. Schmidt, established probable cause to believe the disorder did not exist. The trial court acknowledged Dr. Schmidt's testimony and credentials but nevertheless found that the issue could not be resolved simply by testimony as to whether the diagnosis existed in the DSM. In making this determination, the trial court did not engage in improper weighing of competing testimony but, rather, found that the diagnosis supported respondent's status as a sexually violent person even taking as true Dr. Schmidt's testimony that the diagnosis does not exist in the DSM. In this respect, we note that Dr. Schmidt only testified that the diagnosis did not exist in the DSM and he offered no opinion on the ultimate question of whether the diagnosis could support civil commitment under the Act.

¶ 55     Respondent next contends that even if he suffers from paraphilia NOS, nonconsent, it is no longer severe enough to justify his civil confinement. Respondent relies upon Dr. Schmidt's testimony that respondent does not suffer from a paraphilia of any kind and upon evidence which he claims establishes that his GAF score, which measures his symptom severity and level of functioning, indicates that his paraphilia is not severe.

¶ 56     Respondent's evidence on this issue came primarily from the testimony of Dr. Schmidt. However, we reiterate that notwithstanding the doctor's testimony and his reliance upon respondent's GAF score, Dr. Schmidt never offered an expert opinion that respondent did not suffer from any mental disorder or that it was not substantially probable that respondent would engage in acts of sexual violence if he was released into the community. These are required elements under the statute and respondent was required to offer testimony on these issues.

¶ 57     Moreover, although Dr. Schmidt testified that respondent does not suffer from a paraphilia, we believe that the trial court could consider the lack of a basis for Dr. Schmidt's opinion on this issue without exceeding the standards set forth in *Hardin*. Contrary to respondent's suggestion, *Hardin* does not preclude a trial court from making any credibility determinations or from considering the quality of the evidence presented. Instead, *Hardin* expressly states that a "plausible account" on each element must be presented and that the trial court therefore "need not ignore blatant credibility problems." *Hardin*, 238 Ill. 2d at 48 (citing *Watson*, 595 N.W.2d at 420). Moreover, the requirement that a "plausible account" on each element be presented means that each element must be supported by "actual evidence" or a "reasonable inference" based on that evidence and that "mere argument" is insufficient to meet this burden. *Hardin*, 238 Ill. 2d at 51-52. It follows that in order to determine whether the evidence presented is "plausible," or based upon a "reasonable" inference, the trial court must necessarily consider, to some extent, the quality of that evidence. For this reason, we do not believe that respondent's burden in this case could be met simply by presenting the testimony of an expert witness who based his opinions primarily on information provided by defense counsel and who has never been qualified as an expert in a sexually violent persons case or in the evaluation of sexual offenders. Rather, the expert's opinion must be based upon actual evidence or a reasonable inference from that

-18-

evidence and, if it is not, the opinion is no more than "mere argument." See, *e.g., Kleiss v. Cassida*, 297 Ill. App. 3d 165, 174 (1998) ("An expert opinion is only as valid as the reasons for the opinion."). Thus, while *Hardin* states that a trial court may not choose between competing inferences or delve extensively into the credibility of a witness, the court still must be able to evaluate the basis of an expert's opinion to determine whether it constitutes "actual" or "plausible" evidence and not simply "mere argument."

¶ 58        In this case, it is apparent from the record that the trial court essentially determined that respondent's evidence suffered from the type of "blatant credibility problems" that a trial court "need not ignore." See *Hardin*, 238 Ill. 2d at 48. Dr. Schmidt testified that respondent does not suffer from any type of paraphilia and that, instead, respondent's pre-rape history provided the most "plausible" explanation of why he committed multiple rapes. Specifically, Dr. Schmidt testified that respondent reported having an experience as a teenager in which a woman he was attempting to have intercourse with initially resisted and then consented. According to Dr. Schmidt, respondent thereafter believed that "when women say no they really mean yes." Dr. Schmidt further explained that respondent was acting selfishly when he committed his first rape and that he committed additional rapes because he thought that "the law had no teeth." Dr. Schmidt, however, provided no foundation to support his opinion on this issue. See *Kleiss*, 297 Ill. App. 3d at 174. He cited no authority, study, or treatise of any kind to opine that these were the reasons why respondent committed multiple rapes. Instead, he simply stated that these experiences provided "as plausible an explanation as maybe we'll ever get from the facts of the case." The trial court found that Dr. Schmidt's explanation "was absolutely, totally, completely absurd, quite frankly." The court also observed that there was something "very troubling about his testimony and his evaluation of sexually violent persons, which is the first, apparently, he's done."

¶ 59        We need not decide, however, whether these "blatant credibility problems" justify the dismissal of respondent's petition because we have already concluded that respondent did not offer any testimony to support the statutory requirements of the Act. This is not a case of conflicting facts and inferences or of expert witnesses who reached opposite conclusions regarding whether respondent should be discharged or conditionally released. Instead, this is a case about the failure to offer any testimony to satisfy the statutory elements. And although respondent claims that the trial court improperly credited the testimony of the State's expert witnesses, we note that respondent carried the burden of proof at the probable cause hearing. Thus, if the trial court found that respondent's evidence was insufficient to meet his burden of proof, dismissal of his petition was proper regardless of the evidence presented by the State.

¶ 60        We also find that, contrary to respondent's assertion, the trial court did not disregard the evidence of respondent's improved GAF scores. The State's experts acknowledged the improvement and the trial court stated that there was "an improvement to some extent in [respondent's] condition," pointing to respondent's GAF scores and to respondent's acknowledgment that he had committed some of the crimes with which he was charged. However, the ultimate question before the trial court was not whether respondent's GAF scores had improved. The ultimate question was whether respondent had made sufficient progress to be released into the community and specifically whether an expert witness could

say to a reasonable degree of psychological or psychiatric certainty that respondent did not suffer from a mental disorder and that it was not substantially probable that respondent would engage in acts of sexual violence if released into the community. While an improved GAF score was relevant to these issues, it was not dispositive as to the ultimate question before the trial court and was only one of many factors that the trial could consider in determining whether there was probable cause to believe that respondent had made sufficient progress to be discharged or conditionally released.

¶ 61     For example, while acknowledging the improved GAF score, the trial court also observed that respondent had refused to participate in any formal sexual offender treatment while in the DHS. Dr. Suire and Dr. Ostrov each testified that such treatment can significantly decrease the likelihood that a person will sexually reoffend. In contrast, Dr. Schmidt offered no expert testimony on the issue of respondent's refusal to participate in treatment and he did not explain how that refusal factored into the opinions he did offer. Nor did he ever opine that based upon the GAF scores, it was not substantially probable that respondent would commit acts of sexual violence if he were released into the community. We do not believe that the trial court was required to disregard this unrefuted evidence when making a probable cause determination, particularly because respondent's failure to participate in formal treatment exists independent of any credibility determinations or weighing of evidence. See, *e.g.*, *In re Detention of Cain*, 341 Ill. App. 3d 480, 483 (2003) (trial court considered that the respondent "remained exceedingly resistive to clinical treatment" in making probable cause determination); *In re Commitment of Blakey*, 382 Ill. App. 3d 547, 552 (2008) (considering that the respondent had not yet participated in any sex-offender-specific treatment program).

¶ 62     Finally, we observe that in *Stanbridge*, the appellate court recently considered a trial court's finding of no probable cause in light of the standards set forth in *Hardin*. In that case, the evidence at the probable cause hearing consisted of two written reports prepared by expert witnesses that presented conflicting opinions as to whether the respondent was a suitable candidate for release from DHS custody and care. The respondent's expert, Dr. Kirk Witherspoon, was of the opinion that the respondent did not present any historic or current antisocial tendencies or any form of deviant sexual psychopathology, and that he presented a low risk of recidivism based upon actuarial assessments. *Stanbridge*, 408 Ill. App. 3d at 555-56. Dr. Witherspoon recommended that the respondent be discharged from DHS care and control based on his expert opinion that the respondent did not demonstrate significant emotional, interpersonal, behavioral, or cognitive problems. *Stanbridge*, 408 Ill. App. 3d at 556. The State's expert diagnosed respondent with a mental disorder, found him to be at a high risk of recidivism, and identified additional aggravating factors. The expert opined that it was substantially probable that the respondent would engage in future acts of sexual violence and that the respondent had not made sufficient progress to be safely managed in the community. *Stanbridge*, 408 Ill. App. 3d at 557. The appellate court reversed the trial court's finding of no probable cause, concluding that the trial court had improperly weighed the conflicting evidence instead of determining whether the respondent's evidence that he was no longer a sexually violent person was plausible. The appellate court noted that the trial court relied upon the State's expert, discounted the evidence presented by the respondent's expert, and placed greater emphasis on the State's expert evidence. *Stanbridge*, 408 Ill. App.

3d at 563.

¶ 63    We agree with the *Stanbridge* decision. However, we find that the facts in *Stanbridge* are distinguishable from those in the present case. The trial court in *Stanbridge* was presented only with written reports, whereas the trial court in this case heard testimony from the expert witnesses. In addition, the expert in *Stanbridge*, Dr. Witherspoon, a qualified expert, provided a plausible account on each of the required elements by way of a written report and offered an evidentiary basis for his opinions. Dr. Schmidt, however, did not offer expert testimony that respondent did not suffer from any mental disorder or that it was not substantially probable that respondent would commit acts of sexual violence if he was discharged or conditionally released. Unlike Dr. Witherspoon, Dr. Schmidt offered no testimony that respondent in this case could be safely managed in the community or that he was a suitable candidate for conditional release or discharge. Had respondent offered any expert testimony to establish the statutory elements for discharge or conditional release, we would not hesitate to remand for a full evidentiary hearing.

¶ 64    Although the dissenting justice suggests that a probable cause hearing should be conducted under these facts, he does not set out any testimony supporting a complete discharge of respondent under section 65. Nor does he respond to the statute's requirement for a conditional release under section 60(c) that mandates expert testimony to establish the conditions for release or the type of treatment and services that person may need. In any event, we have already concluded that Dr. Schmidt was not qualified to give such an opinion because of his failure to be approved by the Illinois Sex Offender Management Board, which was likely due to his complete lack of experience in treating sexually violent persons. The dissent agrees that Dr. Schmidt's explanation for respondent's "criminal serial behavior" was "preposterous on its face." And he opines that Dr. Schmidt's contention that respondent never suffered from paraphilia is foreclosed by the jury's verdict in 2006. And yet the dissent suggests that respondent's improved GAF score and the fact that respondent was not diagnosed with paraphilia while in prison amounts to probable cause. We disagree that this establishes probable cause to believe that respondent is no longer a sexually violent person or that it is not substantially probable that respondent will commit acts of sexual violence if discharged or conditionally released.

¶ 65    We conclude that respondent's petition for release or conditional discharge was properly dismissed. We base this conclusion upon our *de novo* review of the entire record, which discloses the complete lack of an expert opinion that respondent is no longer a sexually violent person or that it is not substantially probable that respondent will engage in future acts of sexual violence. Respondent was required to provide plausible evidence of these statutory requirements and his failure to do so requires us to find that the evidence presented to the trial court did not establish probable cause to believe that respondent had made sufficient progress to be discharged or conditionally released. Accordingly, the judgment of the circuit court of Cook County is affirmed.

¶ 66    Affirmed.

¶ 67    PRESIDING JUSTICE GARCIA, dissenting:

-21-

¶ 68    To give context to my dissent, I begin with the petitions filed by respondent Lieberman. When the supreme court directed we vacate our original decision and reconsider in light of *In re Detention of Hardin*, 238 Ill. 2d 33 (2010), we permitted the parties to file supplemental briefs to inform us of the impact of *Hardin* on this case. According to Lieberman's supplemental brief, he filed petitions under sections 60 and 65 of the Sexually Violent Persons Commitment Act (Act). 725 ILCS 207/60, 65 (West 2008). Under section 60, the petition seeks conditional release; under section 65, the petition seeks discharge. Each section provides for a probable cause hearing to determine whether the merits of the petition should be reached. The probable cause issue differs under each section, as does the nature of the hearing on the merits. I find it doubtful that the Act contemplated the simultaneous consideration of petitions under both section 60 and section 65.

¶ 69    Under section 60, before a hearing on the merits will ensue, the committing court must determine that "cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release." 725 ILCS 207/60(c) (West 2008). Section 60 is silent on whether the respondent may be present at the probable cause hearing. Regarding the hearing on the merits, section 60 provides that "[t]he court, *without a jury*, shall hear the petition." (Emphasis added.) 725 ILCS 207/60(d) (West 2008). At the hearing on the merits, the State must prove by clear and convincing evidence that the respondent "has not made sufficient progress to be conditionally released." 725 ILCS 207/60(d) (West 2008).

¶ 70    Under section 65(a)(1), a committed person may request permission to file a discharge petition. "If the Secretary determines at any time that a person committed under this Act is no longer a sexually violent person, the Secretary shall authorize the person to petition the committing court for discharge." 725 ILCS 207/65(a)(1) (West 2008). Under section 65(b)(1), a petition may be filed without the Secretary of Human Services's permission, as Lieberman did here. 725 ILCS 207/65(b)(1) (West 2008). Should a petition be filed without permission, the respondent may be required to plead additional facts in a successive petition for discharge. "[I]f a person has previously filed a petition for discharge without the Secretary's approval and the court determined, either upon a review of the petition or following a hearing, that the person's petition was frivolous or that the person was still a sexually violent person, then the court shall deny any subsequent petition under this Section without a hearing unless the petition contains facts upon which a court could find that the condition of the person had so changed that a hearing was warranted." 725 ILCS 207/70 (West 2008). Section 65 expressly provides: "The committed person has a right to have an attorney represent him or her at the probable cause hearing, but *the person is not entitled to be present at the probable cause hearing*." (Emphasis added.) 725 ILCS 207/65(b)(1) (West 2008). The question at the probable cause hearing is whether "probable cause exists to believe that the committed person is no longer a sexually violent person." 725 ILCS 207/65(b)(2) (West 2008). Under section 65, the hearing on the merits of the petition differs as well. "The committed person or the State may elect to have a hearing under this Section *before a jury*." (Emphasis added.) 725 ILCS 207/65(b)(2) (West 2008).

¶ 71    Based on the differences in the proceedings under sections 60 and 65, it seems clear that the committing court should address a section 60 petition before considering a section 65

petition. See 725 ILCS 207/65(b)(1) (West 2008) (committed person is barred from being present at section 65 probable cause hearing). If probable cause exists to permit a hearing under section 60, the commitment court will hear the petition without a jury. If the section 60 petition fails either at the probable cause or the merits stage, it follows that the section 65 petition cannot succeed. Consequently, I address the probable cause issue in the context of the section 60 petition only.[6]

¶ 72    In light of *Hardin*, I submit the proceedings below far exceeded a section 60 "probable cause" hearing. 725 ILCS 207/60(c) (West 2008). What transpired below was more in the nature of a full evidentiary hearing that reached the merits of the respondent's petition, a determination which our supreme court ruled should not be made at a SVP probable cause hearing. *Hardin*, 238 Ill. 2d at 48-49 ("trial court [improperly] weighed the conflicting evidence *** as well as delving extensively into the credibility" of the expert's testimony); see also *Stanbridge*, 408 Ill. App. 3d at 561 (at probable cause hearing there should be "[no] weighing of conflicting expert opinions but, instead, determining whether reasonable grounds exist"). Given the state of the record before us, we should remand to the circuit court to formally permit a full hearing. A ruling on the merits of the section 60 petition can issue on this record, supplemented by the parties as the circuit court may allow at its discretion.

¶ 73    At the probable cause hearing in this case, no objection was raised to Lieberman's expert, Dr. Chester Schmidt, providing expert testimony. In fact, the State stipulated "to his expertise." Dr. Schmidt is a professor of psychiatry at Johns Hopkins University and a founding member of the sexual behavior consultation unit at Johns Hopkins Hospital. In addition to Dr. Schmidt's testimony, the respondent testified and the parties stipulated to the testimony of Dr. Mark Babula, the respondent's primary therapist at the Department of Human Services (DHS) treatment facility. On the State's side, the circuit court heard from Dr. Eric Ostrov, board certified in clinical psychology by the American Board of Professional Psychology and a University of Chicago trained lawyer, and from Dr. David Suire, a licensed clinical psychologist.

¶ 74    In *Hardin*, the circuit court conducted a SVP probable cause hearing pursuant to section 30 of the Act on the State's petition. *Hardin*, 391 Ill. App. 3d 211, 217 (2009); 725 ILCS 207/30(a) (West 2008). Notably, a single witness was presented. *Hardin*, 238 Ill. 2d at 37

---

[6]That parties are still sorting out the differences between the two petitions is reflected in the circuit court proceedings in *In re Detention of Stanbridge*, 408 Ill. App. 3d 553 (2011). In that case, Stanbridge filed only a petition seeking discharge under section 70 of the Act, supported by an evaluation by the court appointed expert. *Id.* at 554. Section 70 provides for "additional discharge petitions" to those filed under section 65. 725 ILCS 207/70 (West 2008). The State countered with an evaluation by its own expert that concluded: "(1) respondent's risk assessments coupled with the additional risk factors suggested that a substantial probability existed that respondent would engage in further acts of sexual violence and (2) respondent has *not made sufficient progress* in lowering his sexual-offense-recidivism risk to conclude that he is safe to be managed in the community on conditional release." (Emphasis added.) *Stanbridge*, 408 Ill. App. 3d at 557. Based on that summary, the State's expert addressed the respondent's petition, at least in part, as if it had been filed under section 60. See 725 ILCS 207/60(d) (West 2008).

(the State's expert "was the only witness at the probable cause hearing"). After hearing the testimony of the expert, the circuit court in *Hardin* "concluded that 'there has not been any testimony of any behavior on the part of [respondent] which would give probable cause to believe that he suffers from any kind of disorder, a personality disorder. The lack of any evidence and testimony of any disciplinary matters or anything else that would indicate an antisocial personality really belies my ability to make a finding that he suffers from this classified disorder.' " *Hardin*, 238 Ill. 2d at 38.

¶ 75    I find the conclusion drawn by the circuit court in *Hardin* to be strikingly similar to the conclusion the majority draws here, though on the opposite end of the spectrum from the perspective of the committed person. "[T]his is a case about the failure to offer testimony to satisfy the statutory elements. And although respondent claims that the trial court improperly credited the testimony of the State's expert witnesses, we note that respondent carried the burden of proof at the probable cause hearing." *Supra* ¶ 59.

¶ 76    While the majority correctly notes "that respondent carried the burden of proof," as our supreme court made clear in *Hardin*, there is little to this "burden of proof" at the probable cause stage. In a SVP probable cause hearing, probable cause requires nothing "more than 'a plausible account' on [each] element based on all reasonable inferences from the facts. At a probable cause hearing in a SVP case, the court should not attempt to determine definitively whether each element of the State's claim can withstand close scrutiny as long as some 'plausible' evidence, or reasonable inference based on that evidence, supports it." *Hardin*, 238 Ill. 2d at 51-52; see *Stanbridge*, 408 Ill. App. 3d at 562 (the circuit court improperly weighed "the conflicting testimony of the parties' respective experts instead of determining only whether the evidence presented established probable cause to warrant an evidentiary hearing").

¶ 77    Nor do I agree that the absence of explicit testimony at the probable cause hearing invoking the standard "to a reasonable degree of medical, psychological, or psychiatric certainty" dooms Lieberman's section 60 petition as the majority contends. *Supra* ¶ 51. I submit the "reasonable degree of certainty" standard applies only when the merits are reached. See *Petre v. Cardiovascular Consultants, S.C.*, 373 Ill. App. 3d 929, 943 (2007).

¶ 78    I also cannot agree that the supreme court's statement that trial judges " 'need not ignore blatant credibility problems' (*Hardin*, 238 Ill. 2d at 48)" should be read as a basis to disregard all of the testimony of Lieberman's highly credentialed expert as the majority appears to suggest. *Supra* ¶ 57. While blatant credibility problems of an expert may arise, those problems should be addressed by a challenge to the qualifications of the expert to testify rather than as a basis to completely disregard the testimony of an expert witness. See *Stanbridge*, 408 Ill. App. 3d at 561 (quoting with approval *In re Detention of Cain*, 402 Ill. App. 3d 390, 400 (2010) (Stewart, J., dissenting) (" 'Surely, the written opinion of a qualified expert that a detainee should be discharged meets the probable cause standard.' ")).

¶ 79    The State did not challenge Dr. Schmidt's qualifications to testify; the State's objection to a certain portion of Dr. Schmidt's expert testimony as beyond his expertise was overruled. Also, if the State found significance in the denial of Dr. Schmidt's application to be named to the Illinois Sex Offender Management Board, it should have sought a ruling on whether

that denial impacted his role as an expert. See *People v. Owen*, 299 Ill. App. 3d 818, 822 (1998). I see no reason to resolve this appeal, even partly, on that denial when the State failed to challenge Dr. Schmidt's qualifications to testify at the probable cause hearing. See *Lundell v. Citrano*, 129 Ill. App. 3d 390, 397 (1984) ("Timely objections to the competency of a witness *** are necessary to give the opposing party an opportunity to remedy the defect.").

¶ 80 In any event, Dr. Schmidt presented his expert testimony, without qualification, to the circuit court. As the majority sets out, "Dr. Schmidt reviewed the 15 evaluations of respondent conducted during the 20 years he was in the IDOC, none of which diagnosed respondent with any type of paraphilia. Dr. Schmidt testified that *** it was 'hard to believe that any mental health professional worth his or her salt given the circumstances that he was in jail for raping' would not have found paraphilia if it in fact existed." *Supra* ¶ 12. While I question the conclusion reached by Dr. Schmidt, as I make clear below, the most recent of the 15 evaluations certainly permitted an inference favorable to Lieberman to be drawn. Dr. Schmidt also noted that Lieberman's current Global Assessment of Functioning scores placed him "pretty close to normal at this time." The trial judge recognized something like this as well: "[Lieberman has made] an improvement to some extent." These findings, I submit, constitute "some 'plausible' evidence" to meet the relatively low standard of probable cause. *Hardin*, 238 Ill. 2d at 51-52. Under *Hardin*, Lieberman is entitled to a hearing on the merits on his section 60 petition on whether he "has *** made *sufficient* progress to be conditionally released." (Emphasis added.) 725 ILCS 207/60(d) (West 2008); *Hardin*, 238 Ill. 2d at 52.

¶ 81 To be clear, were this a review of a full hearing on the merits of Lieberman's section 60 petition, I would agree with the circuit court's assessment of certain portions of Dr. Schmidt's testimony. My agreement with the circuit court stems from the different posture of this case than in *Hardin*. Lieberman was found to be a sexually violent person by a jury, which necessarily included a finding beyond a reasonable doubt that he had the mental disorder of "paraphilia nos" at the time. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 601-02 (2007). Dr. Schmidt's contention that Lieberman *never* suffered from the disorder known as paraphilia is foreclosed by the jury's verdict in 2006.

¶ 82 Also, Dr. Schmidt's contention that Lieberman's criminal serial behavior may be explained by his early sexual experience leading him to the conclusion that "no" means "yes" is, as the circuit court judge described it, "absolutely, totally, completely absurd." Setting aside the troubling application of "no" means "yes" in any dating relationship, the rapes that the respondent committed had no semblance to a dating relationship. The respondent, using subterfuge, raped at least eight women that were completely unknown to him. The proffered explanation by Dr. Schmidt of the respondent's criminal behavior is, as Judge Porter concluded, preposterous on its face.

¶ 83 Notwithstanding that some of the circuit court's overall conclusions are well founded, I submit our supreme court's decision in *Hardin* compels that we reverse the circuit court's finding of no probable cause just as the supreme court did in the case before it. I submit the circuit court's ruling in the SVP proceedings in this case was based "on a full and independent evaluation of [Dr. Schmidt's] credibility and [his expert opinion]." *Hardin*, 238 Ill. 2d at 53. Such matters "are inappropriate at the probable cause stage of the SVP

proceedings." *Hardin*, 238 Ill. 2d at 53. In other words, a probable cause finding merely says that a hearing on the merits should ensue. See *Cain*, 402 Ill. App. 3d at 400 (Stewart, J., dissenting) ("[Where] [t]he pleadings and written reports of the two evaluators raised numerous questions of fact," "the detainee is entitled to a trial where a trier of fact weighs the credibility of witnesses, not reports, and determines the ultimate issue").

¶ 84    Finally, I note my substantial disagreement with several of the State's claims in its supplemental brief. First, the State contends that "*Hardin* did not purport to change the methods by which trial courts measure probable cause at the post-commitment stage of SVP proceedings, but instead involved only the standards applicable to pre-commitment probable cause hearings." Not surprisingly, the State cites no authority for its claim that "probable cause" means something different in a precommitment proceeding than it does in a postcommitment proceeding. For this claim to be entitled to any credence, the State had to demonstrate that the legislature meant something different each time it used the identical term in the Act. See *People v. Maggette*, 195 Ill. 2d 336, 350 (2001) ("Where a word is used in different sections of the same statute, the presumption is that the word is used with the same meaning throughout the statute, unless a contrary legislative intent is clearly expressed."). The State offered nothing. The Fourth District's recent decision of *Stanbridge* stands as contrary authority to the State's bald contention, where the court made no suggestion that probable cause meant something different in its review of a postcommitment case than probable cause meant in *Hardin*. Second, the State's contention that "the trial court's credibility findings were not against the manifest weight of the evidence" overextends our supreme court's comparison of a SVP probable cause hearing to a motion to quash arrest and suppress evidence. In the context of a suppression motion, the manifest weight of the evidence standard applies because an Illinois statute compels the circuit court to issue findings of fact, which may include credibility determinations that are entitled to deference on review. See 725 ILCS 5/114–12(e) (West 2006) (order granting or denying a motion to suppress "shall state the findings of fact and conclusions of law upon which the order *** is based"). As the supreme court made clear in *Hardin*, credibility determinations should have little role in a SVP probable cause hearing. *Hardin*, 238 Ill. 2d at 53 (the circuit court improperly made a full and independent evaluation of the expert's credibility, which is "inappropriate at the probable cause stage of the SVP proceedings"). Third and last, the State's contention that the trial court's probable cause determination can be upheld "on the [application of] 'blatant credibility problems' of Respondent's evidence" says nothing more than the circuit court found the State's experts more credible than Dr. Schmidt. I submit the case that properly applies the "blatant credibility problems" standard should be very rare and, in any event, this is not such a case. Certainly it is true the "blatant credibility problems" standard was unknown to the circuit court when it issued its ruling.

¶ 85    I respectfully dissent from my colleagues' decision to affirm the finding of no probable cause by the committing court. However, I agree with my colleagues that the issue of probable cause is subject to *de novo* review. See *Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("determinations of *** probable cause should be reviewed *de novo* on appeal").